UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DOUGLAS F. CARLSON,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES POSTAL SERVICE,<br><br>Defendant. | Case No. 13-cv-06017-JSC<br><br>**ORDER RE: CROSS-MOTIONS FOR SUMMARY JUDGMENT**<br><br>Re: Dkt. Nos. 60, 61 |

Plaintiff Douglas F. Carlson ("Plaintiff"), proceeding pro se, brings this action against Defendant United States Postal Service ("Defendant") pursuant to the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552. Now pending before the Court are the parties' cross-motions for summary judgment regarding Counts 3, 14, and 15 of the complaint. (Dkt. Nos. 60, 61.) Having carefully considered the parties' submissions, and having had the benefit of oral argument on December 17, 2015, the Court GRANTS Defendant's motion and DENIES Plaintiff's cross-motion.

**BACKGROUND**

Plaintiff commenced this action in December 2013, ultimately alleging in a 19-count complaint that Defendant had improperly withheld documents in response to nineteen different FOIA requests.[1] The parties have resolved the majority of these counts. (*See* Dkt. Nos. 58, 59.) However, Counts 3, 14, and 15 remain pending before the Court and are subject to the instant cross-motions for summary judgment. All three counts pertain to Plaintiff's requests for records of certain Postal Service transactions, and Defendant's withholding of responsive records pursuant

---

[1] Plaintiff initiated this action with a ten-count complaint on December 31, 2013, and supplemented to include an additional nine counts on August 24, 2014. (Dkt. Nos. 1, 22-1.)

to FOIA Exemption 3, which applies if another statute prohibits the document's disclosure, in conjunction with 39 U.S.C. § 410(c)(2), which exempts from disclosure Postal Service records that are of a commercial nature and would not be disclosed under good business practice, as described in more detail below.  The background relevant to these three claims follows.

*Count 3.*  In September 2011, Plaintiff submitted a FOIA request for records that would allow him "to determine the number of transactions that occurred in each half-hour period (e.g., 7:00 AM to 7:30 AM, 7:30 AM to 8:00 AM, etc.) at the retail window at Rincon Finance Station[2] [("Rincon")] in San Francisco, California, on each business day in September 2011."  (Dkt. No. 60-2 at 2.)  Defendant responded to the request in November 2011, advising Plaintiff that a number of pages of records were identified as responsive—including pages of product sales charts for Rincon, which list each product transaction during each relevant business day including a description of the product sold, the type of tender the customer used, the start and end time of the transaction, total walk-in revenue, and total number of items sold (Dkt. No. 60-1 ¶ 8)—but they were all being withheld in full pursuant to FOIA Exemption 3 in conjunction with 39 U.S.C. § 410(c)(2).[3]  (Dkt. No. 60-2 at 4-5.)  That same month, Plaintiff appealed the Record Office's response, contending that Defendant had failed to demonstrate how the requested information was exempt from disclosure within the meaning of Section 410(c)(2).  (*Id.* at 11-12.)  Defendant denied Plaintiff's appeal in December 2011, concluding that all of the information contained in the responsive records was of a commercial nature and would not be disclosed under good business practice.  (*Id.* at 14-16.)

*Count 14.*  In April 2014, Plaintiff submitted a FOIA request for records that would allow him to "determine the number of transactions that occurred in each half-hour period . . . at the retail window at Rincon on each business day since January 2, 2013."  (*Id.* at 21.)  Defendant

---

[2] A finance station is a "nondelivery Post Office station or branch that accepts mail from customers and offers retail services to customers and handles their mail."  (Dkt. No. 60-1 ¶ 5 n.2.)

[3] Defendant initially identified 142 pages of responsive records, but amended its response to Plaintiff's request in October 2015 to indicate that there had been an error in their page count and there were actually 227 pages of responsive but withheld documents.  (*See* Dkt. Nos. 60-2 at 4-5, 7.)

responded to the request in June 2014 stating that the responsive record—a spreadsheet listing all transactions at Rincon in half-hour increments for all business days within the requested time period—was being withheld in full under Exemption 3 and Section 410(c)(2).  (*Id.* at 24-25.)  Plaintiff appealed Defendant's decision on this request, and Defendant upheld the decision that Exemption 3 and Section 410(c)(2) barred disclosure.  (*Id.* at 27, 38-40.)

*Count 15.*  In April 2014 Plaintiff submitted a FOIA request seeking records that would allow a person to "determine the number of transactions that occurred in each half-hour period . . . at the retail window" at "each post office, station, or branch in the San Francisco District at which the Postal Service plans to reduce retail hours in April or May 2014" for "each business day since October 1, 2013."  (Dkt. No. 60-2 at 138.)  Due to the volume of records requested, in early May 2014 Defendant informed Plaintiff that it would need additional time to respond to this request.  (*Id.* at 143.)  In June 2014, Defendant responded that it was withholding 216 pages of responsive records in full under Exemption 3 and Section 410(c)(2).  (*Id.* at 146-147.)  Plaintiff appealed in June 2014, and Defendant upheld its decision withholding the records in November 2014.  (*Id.* at 149-153, 160-163.)

The parties have cross-moved for summary judgment of whether Defendant's withholding of information pursuant to Exemption 3 in conjunction with Section 410(c)(2) is proper. (Dkt. Nos. 60, 61.)  In support of its motion, Defendant submitted a declaration and supplemental declaration from Daniel L. Anderson ("Anderson Declaration" and "Second Supplemental Anderson Declaration," respectively), a Senior Delivery Performance Specialist within Defendant's Delivery Field Performance Group.  Mr. Anderson also has experience as Defendant's Retail Operations Specialist, a position in which he created a Postal Service Retail Revenue Plan that estimates the revenue for each post office, station, and branch within a given area, to determine demand for particular products and services and how to select the type of products and services to maximize revenue. (Dkt. Nos. 60-1, 65-1.)  In response to Plaintiff's opposition, Defendant also submitted a Supplemental Declaration from Mr. Anderson ("Supplemental Anderson Declaration") (Dkt. No. 63-1), as well as the declaration of its Chief Privacy Officer, Matthew J. Connolly ("Connolly Declaration").  (Dkt. No. 63-2.)  In support of

3

1 his motion, Plaintiff submitted a declaration on his own behalf ("Plaintiff Declaration"). (Dkt. No.
2 62.)

## LEGAL STANDARD

Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp.*, 477 U.S. at 323. If the moving party meets that burden, the non-moving party must provide "specific facts showing that there is a genuine issue for trial." *Id.* This burden requires more than a "mere scintilla of evidence and instead requires "evidence on which the jury could reasonably find for the [non-moving party]." *Anderson v. Liberty Lobby, Inc.*, 47 U.S. 242, 252 (1986).

Unlike the typical summary judgment analysis, however, "in a FOIA case, we do not ask whether there is a genuine issue of material fact, because the facts are rarely in dispute." *Minier v. CIA*, 88 F.3d 796, 800 (9th Cir. 1996). The FOIA calls for "broad disclosure of Government records." *CIA v. Sims*, 471 U.S. 159, 166 (1985). To ensure broad disclosure, the FOIA "gives individuals a judicially-enforceable right of access to government agency documents." *Lion Raisins v. Dep't of Agric.*, 354 F.3d 1072, 1079 (9th Cir. 2004); 5 U.S.C. § 552. The FOIA specifically provides, in relevant part, that: "each agency, upon any request for records which (i) reasonably describes such records and (ii) is made in accordance with published rules stating the time, place, fees (if any), and procedures to be followed, shall make the records promptly available to any person." 5 U.S.C. § 552(a)(3)(A). There is a strong presumption in favor of disclosure, *see U.S. Dep't of State v. Ray*, 502 U.S. 164, 173 (1991). This "general philosophy of full agency disclosure [applies] unless information is exempted under clearly delineated statutory language." *John Doe Agency v. John Doe Corp.*, 493 U.S. 146, 151-52 (1989) (quotation marks and citation omitted). These exemptions "must be narrowly construed." *John Doe Agency*, 493 U.S. at 154.

The government agency bears the burden to prove a particular document or redaction falls within one of the nine statutory exemptions from disclosure. *Ray*, 502 U.S. at 173; *Lahr v. NTSB*, 569 F.3d 964, 973 (9th Cir. 2009). The government may rely on affidavits to satisfy its burden of

demonstrating that an exemption applies, but the affidavits must contain "reasonably detailed descriptions of the documents and allege facts sufficient to establish an exemption." *Kamman v. IRS*, 56 F.3d 46, 48 (9th Cir. 1995) (quoting *Lewis v. IRS*, 823 F.2d 375, 378 (9th Cir. 1987)); *see also Shannahan v. IRS*, 672 F.3d 1142, 1148 (9th Cir. 2012) ("To justify withholding, the government must provide tailored reasons in response to a FOIA request. It may not respond with boilerplate or conclusory statements."); *Church of Scientology v. Dep't of the Army*, 611 F.2d 738, 742 (9th Cir. 1980) (noting that the government "may not rely on conclusory and generalized allegations of exemptions"). "[S]ummary judgment on the basis of such agency affidavits is warranted if the affidavits describe the documents and the justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemption, and are not controverted by either contrary evidence in the record nor by evidence of agency bad faith." *Military Audit Project v. Casey*, 656 F.2d 724, 738 (D.C. Cir. 1981).

Even if an exemption is applicable, an agency may only withhold the information to which the exemption applies. *Yonemoto v. Dep't of Veterans Affairs*, 686 F.3d 681, 688 (9th Cir. 2012). The agency is therefore required to provide all "reasonably segregable" portions of the records to the requester. 5 U.S.C. § 552(b). "The burden is on the agency to establish that all reasonably segregable portions of a document have been segregated and disclosed." *Pac. Fisheries, Inc. v. United States*, 539 F.3d 1143, 148 (9th Cir. 2008). "To meet its burden in this regard, the agency must provide[ ] a detailed justification and not just conclusory statements." *ACLU of N. Cal. v. FBI*, No. C 12-03728 SI, 2014 WL 4629110, at *3 (N.D. Cal. Sept. 16, 2014) (internal quotation marks and citation omitted).

**DISCUSSION**

Defendant relies on the Anderson Declaration to contend that it properly relied on Exemption 3 in conjunction with Section 410(c)(2) to withhold the documents responsive to all three FOIA requests at issue.

**I.    Statutory Framework**

Exemption 3 permits an agency to withhold information that is "specifically exempted

5

from disclosure by statute," provided that the statute either (i) "requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue"; or (ii) "establishes particular criteria for withholding or refers to a particular types of matters to be withheld[.]" 5 U.S.C. § 552(b)(3). The purpose of Exemption 3 is "to assure that Congress, not the agency, makes the basic nondisclosure decision." *Ass'n of Retired R.R. Workers v. U.S. R.R. Ret. Bd.*, 830 F.2d 331, 336 (D.C. Cir. 1987). The Ninth Circuit employs a two-part inquiry to determine whether Exemption 3 applies to a particular FOIA request. *Hamdan v. U.S. Dep't of Justice*, 797 F.3d 759, 776 (9th Cir. 2015); *Carlson v. U.S. Postal Serv.*, 504 F.3d 1123, 1127 (9th Cir. 2007) (citation omitted). First, the court must "determine whether the withholding statute meets the requirements of Exemption 3." *Carlson*, 504 F.3d at 1127. If the answer to that question is yes, then the court "determine[s] whether the requested information falls within the scope of the withholding statute."

Section 410(c)(2) was adopted as part of the Postal Reorganization Act ("PRA"), which Congress enacted to "eliminate outmoded 'legislative, budgetary, financial, and personnel files' so that [the Postal Service] could employ 'modern management and business practices' to provide the American public with 'efficient and economical postal service.'" *Carlson*, 504 F.3d at 1127 (quoting H.R. Rep. No. 91-1104, 91st Cong. Sess., at 2 (1970), *reprinted in* 1970 U.S.C.C.A.N. 3649, 3650). As part of this push towards modern business practices, Section 410(c)(2) provides that the Postal Service is not required to disclose "information of a commercial nature, including trade secrets, whether or not obtained from a person outside the Postal Service, which under good business practice would not be publicly disclosed." 39 U.S.C. § 410(c)(2). The "provision is commonly known as the 'good business exemption,' enacted because Congress intended the Postal Service to 'operate more like a private business than a governmental agency[,]'" *Reid v. U.S. Postal Serv.*, No. 05-cv-294 DRH, 2006 WL 1876682, at *5 (S.D. Ill. July 5, 2006) (citing *Wickwire Gavin, P.C. v. U.S. Postal Serv.*, 356 F.3d 588, 592 (4th Cir. 2004)), even though the PRA still required the Postal Service to be a "basic and fundamental service provided to the people by the Government" with different goals than private enterprise, *Carlson*, 504 F.3d at 1128. Notably, in 2006, with the passage of the Postal Accountability and Enhancement Act (Pub L. No.

1    109-435, 120 Stat. 2198), Congress granted the Postal Service increased pricing flexibility to

2    respond to market conditions and do more than merely break even, as the PRA required, thus

3    further emphasizing the business-like aspects of the agency.  *See* Pub. L. No. 109-435, 120 Stat.

4    2198.

5            With all of this legislative history in mind, the parties agree that Section 410(c)(2) meets

6    the requirements of Exemption 3.[4]  (*See* Dkt. No. 61 at 8 ("[P]laintiff believes that, based on the

7    structure of section 410, Congress intended 39 U.S.C. § 410(c)(2) as an exemption 3 statute.").)

8    Indeed, all courts that have addressed the question have determined that Section 410(c)(2) is the

9    type of statute that Exemption 3 contemplates inasmuch as it refers to particular types of matters to

10   be withheld.  *See, e.g.*, *Wickwire Gavin*, 356 F.3d at 592; *Reid*, 2006 WL 1876682, at *5; *Airline

11   Pilots Ass'n, Int'l v. U.S. Postal Serv.*, No. 03-2384 (ESH), 2004 WL 5050900, at *5 (D.D.C. June

12   24, 2004) (collecting cases); *Piper & Marbury, L.L.P. v. U.S. Postal Serv.*, No. CIV.A. 99-2383

13   (JMF/CKK), 2001 WL 214217, at *3 (D.D.C. Mar. 6, 2001) (citation omitted); *Nat'l W. Life Ins.

14   Co. v. United States*, 512 F. Supp. 454, 459 (N.D. Tex. 1980) ("I hold that 'good business

15   practices' creates a sufficiently definite standard to justify exclusion of information that would

16   otherwise be disclosed under the FOIA, and Section 410(c)(2) qualifies as an exemption statute

17   under 5 U.S.C. [§] 552(b)(3)(B).").  In other Exemption 3 cases invoking Section 410(c)(2), the

18   courts have accepted the parties' agreement, without making an explicit determination that Section

19   410(c)(2) is an Exemption 3 statute.  *See, e.g.*, *Carlson*, 504 F.3d at 1127 ("[W]e assume without

20   deciding that [Section] 410(c)(2) qualifies as an Exemption 3 statute for the purposes of this

21   appeal and proceed directly to the question of whether the requested records fall within the scope

22   of § 410(c)(2)."); *Am. Postal Workers' Union, AFL-CIO v. U.S. Postal Serv.*, 742 F. Supp. 2d 76,

23   80 (D.D.C. 2010) ("As a threshold matter, the parties agree that § 410(c)(2) is a statute of

24   exemption as contemplated by Exemption 3."); *Fair Political Practices Comm'n v. U.S. Postal

25   Serv.*, No. 2:12-cv-00093-GEB-CKD, 2012 WL 4953184, at *2 (E.D. Cal. Oct. 16, 2012) (given

---

[4] Plaintiff argues that Defendant's "excessively broad interpretation of [Section 410(c)(2)] threatens the statute's qualification as an Exemption 3 statute" (Dkt. No. 61 at 7), but ultimately concedes that it does fall within Exemption 3's reach.  (*Id.* at 8.)

the parties agreement, assuming without deciding that Section 410(c)(2) qualifies as an Exemption 3 statute) (citation omitted).  Given the parties' agreement here, this Court likewise assumes that Section 410(c)(2) properly qualifies as an Exemption 3 statute inasmuch as it refers to a particular type of matter to be withheld.

## II.  Whether the Information Requested Falls Within Section 410(c)(2)

The next question is whether the information requested falls within Section 410(c)(2)'s protective reach.  *See Carlson*, 504 F.3d at 1127.  Defendant argues that it has met its burden of demonstrating that it does based on the Anderson Declarations.  Plaintiff disagrees on two grounds: first, that the requested information is not "of a commercial nature" within the meaning of Section 410(c)(2); and second, that Defendant has not met its burden of establishing that "good business practices" would prevent the disclosure of the requested information.

### A.  *Information of a Commercial Nature*

Section 410(c)(2) does not define "commercial."  Nor do Postal Service Regulations.  *See Carlson*, 504 F.3d at 1128 n.1.  However, Postal Service regulations list eight nonexclusive categories of "information of a commercial nature" "which under good business practice would not be publicly disclosed":

> (i) Information pertaining to methods of handling valuable registered mail.
>
> (ii) Records of money orders . . . [.]
>
> (iii) Technical information concerning postage meters and prototypes submitted for Postal Service approval prior to leasing to mailers.
>
> (iv) Reports of market surveys conducted by or under contract in behalf of the Postal Service.
>
> (v) Records indicating rural carrier lines of travel.
>
> (vi) Records compiled within the Postal Service which would be of potential benefit to persons or firms in economic competition with the Postal Service.
>
> (vii) Information which, if publicly disclosed, could materially increase procurement costs.
>
> (viii) Information which, if publicly disclosed, could compromise testing or examination materials.

29 C.F.R. § 265.6(b)(3)(2005). Without a statutory or regulatory definition, the Ninth Circuit looked to the "common meaning" of the word "commercial," turning to dictionary definitions and descriptions from other cases. *Carlson*, 504 F.3d 1123, 1128 (citations omitted). The *Carlson* court noted that various dictionaries have defined "commercial" as "occupied with or engaged in commerce or work intended for commerce; of or relating to commerce[,]" and "relate[d] to or connected with trade and traffic or commerce in general[.]" *Id.* The court also credited a prior Ninth Circuit decision that stated that "[i]nformation is commercial if it relates to commerce, trade, or profit." *Id.* at 1129 (citing *McClellan Ecological Seepage Situation v. Carlucci*, 835 F.2d 1282, 1285 (9th Cir. 1987)).

Courts have upheld withholding for a variety of types of information, frequently pertaining to cost and pricing information either internal to the Postal Service or between the Postal Service and a third party client. *See, e.g.*, *Wickwire Gavin*, 356 F.3d at 597 (spreadsheets detailing quantity and pricing information in contract between Postal Service and a third party mailing supply contractor); *Reid*, 2006 WL 1876682, at *6 (Postal Service financial reports, including postage statements for a particular Post Office customer); *Am. Postal Workers Union*, 742 F. Supp. 2d at 81 (information containing the agency's decisions regarding bonuses and salary increases for its employees); *Airline Pilots Ass'n Int'l*, 2004 WL 5050900 (redacted information in delivery agreements between Postal Service and FedEx including pricing and rates); *Robinett v. U.S. Postal Serv.*, *Piper & Marbury*, 2001 WL 214217, at *3 (figures and data about shipping of certain items included in agreements between Postal Service and third party shipper). The Ninth Circuit, in conducting its own survey, concluded that "[t]he majority of cases which have upheld [the Postal Service's] withholding of information under [Section] 410(c)(2) have concerned proprietary information." *Carlson*, 504 F.3d at 1129 (citations omitted). In contrast, some cases have found that information about Postal Service hours and locations and names of employees is not commercial information within the meaning of the statute. *See, e.g.*, *Carlson*, 504 F.3d at 1130 (post office names, addresses, telephone numbers, hours of operation, and final collection times); *Nat'l W. Life Ins.*, 512 F. Supp. at 462 (names and addresses of employees).

For example, in *Airline Postal Workers Union*, the court found that records including

9

"information about the agency's decisions regarding bonuses and salary increases for its employees" was commercial information because the records were "based on individual, unit and corporate performance indicators devised by the Postal Service and reflecting the agency's efforts to improve customer service, generate revenue, manage costs, and enhance a performance-based culture." 742 F. Supp. 2d at 81. In contrast, in *Carlson*, post office names, addresses, telephone numbers, hours of operation, and final collection times were not commercial information because the information was not proprietary, was already publicly available, and ultimately, while "[m]ail service may be essential to commerce and trade," the information at issue is not commercial even though it has some value. 504 F.3d at 1129-30.

Generally, "the commercial nature of information must be established without resort to who the Plaintiff is or what use the plaintiff may make of the information." *Nat'l W. Life Ins. Co.*, 512 F. Supp. at 460; *see also Forest Serv. Emps. Envt'l Ethics v. U.S. Forest Serv.*, 524 F.3d 1021, 1025 (9th Cir. 2008) (noting that the reasons why the plaintiff requests information is irrelevant to the determination of whether an exemption applies).

Here, the information sought in all three FOIA requests at issue are spreadsheets indicating the number of transactions at given Postal Service locations in half-hour increments during the requested time periods. Defendant relies on the Anderson Declaration in conjunction with one of the Postal Service regulations to establish that the transaction counts are commercial information. Code Section 265.6(b)(3) defines as commercial information "[r]ecords compiled within the Postal Service which would be of potential benefit to persons or firms in economic competition with the Postal Service." 29 C.F.R. § 265.6(b)(3)(vi). According to Mr. Anderson, transaction counts do just that. Because they demonstrate when a particular Postal Service location tends to be more or less busy, the information permits the Postal Service to adjust staffing levels to meet consumer demand. (Dkt. No. 60-1 ¶¶ 11, 14, 19, 26; Dkt. No. 65-1 ¶ 4.) Competitors that offer similar products and service lines as the Postal Service could use the Postal Service's transaction count information to "determine markets where the opportunity to compete appears strongest" or to adjust their own staffing to hire more staff during a nearby Postal Service location's busiest times to offer shorter wait times and lines, thus drawing customers away from the Postal Service.

(*Id.* ¶¶ 4-6.)

Plaintiff urges the Court to reject the Anderson Declaration on several grounds. Some attack Mr. Anderson's specific word choices—*e.g.*, taking issue with labeling the Postal Service's collection of transaction data as "market research." Such a challenge is without substance. Similarly, Plaintiff argues that Mr. Anderson "confuses revenue and volume with profitability" in explaining the commercial use of the information at issue. But the actual profitability is irrelevant, since Mr. Anderson has described how Defendant uses the number of transactions per half hour to make staffing decisions. More importantly, Plaintiff contends that the Anderson Declaration consists only of conclusory allegations that Exemption 3 applies. Not so. Instead, far from simply stating that the information is commercial, the Anderson Declaration lays out facts that identify the information in the responsive records and describes its commercial use, as described above.

The Court therefore credits the factual allegations in the Anderson Declarations, which together establish that the transaction information at issue here is "commercial in nature" unlike the publicly available location and business hours data at issue in *Carlson*. While the data in *Carlson* pertained to hours of operation and location, the information here is numbers of separate instances of commerce within a particular time period. The Anderson Declarations' explanation of the commercial *use* of this information further underscores its commercial nature. Plaintiff contends that this information is neither commercial nor proprietary because it is information that any individual could collect by walking into a Postal Service branch and observing the number of customers. But the Anderson Declaration has dispelled that contention, as well: while any man on the street could count the number of customers who enter a branch and approach the register, only internally collected data includes the actually number of transactions completed, since some customers complete more than one transaction per visit. (Dkt. No. 63-1 ¶ 7.) Moreover, Mr. Anderson further avers that it is number of transactions per half hour, not numbers of customers, that Defendant uses to calibrate staffing decisions. (*Id.*) Thus, to the extent Plaintiff is attempting to challenge the information as not proprietary, which the *Carlson* court identified as a hallmark of information deemed commercial for the purposes of Section 410(c)(2), *see* 504 F.3d at 1129 (citations omitted), this argument fails.

1       Trying a different tack, Plaintiff argues that the information he requested is about *past*
2   transaction data and, even if the data was commercially valuable at the time it was collected, it no
3   longer carries any commercial value now, years later.  But Mr. Anderson has explained that
4   transaction data dating back to 2011 may well still be relevant for certain locations today, and
5   without comparing the older data to current data to demonstrate a change, the information still
6   holds commercial value.  (Dkt. No. 63-1 ¶ 8.)  Plaintiff has not proffered any evidence to counter
7   Mr. Anderson's assertion.
8       In his own request for summary judgment, the gravamen of Plaintiff's argument is
9   threefold: first, he contends that the information is plainly not commercial just like the information
10  in *Carlson*.  But for the reasons set forth above, the Court does not find the comparison persuasive
11  in light of the facts averred in the Anderson Declarations.  Second, Plaintiff urges that the
12  Anderson Declaration merely shows that the requested transaction information has a commercial
13  *use,* but is not "commercial in nature" as the statute requires.  Ironically, the *Carlson* decision on
14  which Plaintiff so heavily relies made no distinction between the word "commercial" and the term
15  "commercial in nature."  Instead, in attempting to understand "commercial in nature" for the
16  purposes of Section 410(c)(2), the court defined the word "commercial," and considering those
17  definitions, concluded that the information at issue was not "commercial in nature."  504 F.3d at
18  1129.  Certainly, the court noted that just because the hours-and-location information at issue in
19  *Carlson* was potentially valuable to the Postal Service did not make it "commercial" or
20  "commercial in nature."  *Id.*  And the Anderson Declarations indicate that the transactions-per-
21  half-hour data is valuable to Defendant inasmuch as it contributes to making staffing decisions.
22  But the Court need not reach the same conclusion as *Carlson*: while the information's value alone
23  does not render it commercial, here the data is about transactions—*i.e.*, commerce.  Where the
24  information *is* commercial in nature, *Carlson* does not rule out the possibility that, consistent with
25  Postal Service regulations, the use of the information is one factor that may contribute to finding
26  the information commercial for the purposes of Section 410(c)(2).  *See* § 265.6(b)(3)(vi).
27      At oral argument, Plaintiff urged the Court to follow *Fair Political Practice Commission v.*
28  *United States Postal Service*, in which an Eastern District of California court held that numerical

12

information regarding the quantity of mail sent by a single Postal Service customer was not of a "commercial nature" for the purposes of Section 410(c)(2). 2012 WL 4953184, at *4. There, the plaintiff was a government agency responsible for investigating possible violations of state election law that had received complaints that a certain elected official had violated state disclosure requirements by mailing a large number of items in connection with a local election that had since passed. *Id.* at *1, 3. The court concluded that the requested information, which it defined as "the amount of mail sent by a noncommercial entity in connection with a noncommercial election" on three particular dates using a mass mailing permit, was not commercial and therefore had to be disclosed. *Id.* at *3. *Fair Political Practice Commission* is distinguishable. The requested information pertained to the number of mailings by a single non-commercial customer, rather than, as here, a request for all commercial transactions at a given Postal Service location for a given time period. Next, the court noted that the Postal Service did not show that disclosure of the information could cause it harm; in contrast, here the Anderson Declarations support such a conclusion. Similarly, the court further noted that the Postal Service had not shown that the requested information was proprietary; in contrast, here Mr. Anderson has averred that the Postal Service has not disclosed the transaction information that Plaintiff seeks. Ultimately, the *Fair Political Practice Commission* court concluded that the Postal Service offered only conclusory allegations of the information's commercial nature. *Id.* at *4. Not so here, for the reasons discussed above.

The remaining emphasis of Plaintiff's argument is that Defendant is drastically over-inclusive in its own interpretation of what counts as commercial information subject to withholding pursuant to Section 410(c)(2). (*See, e.g.*, Dkt. No. 62 ¶ 9.) But this does not factor into the Court's analysis. Instead, the Court is tasked only with determining whether the transactions-per-half-hour information is commercial in nature. The Court concludes that it is.

B.   *Good Business Practice*

The Ninth Circuit has not yet addressed how to determine whether the information is the type that is not disclosed under good business practices, as the *Carlson* court ended its inquiry at the first step of the analysis, finding the information at issue not commercial in nature. 504 F.3d at

13

1130. The Court will therefore consider the persuasive authority from other circuits.

In *Wickwire Gavin*, the Fourth Circuit noted that "[i]t is uncontroverted that the statutory term 'good business practice' should be decided with reference to what businesses normally do." 356 F.3d at 594.  District courts across the country have taken a similar approach, looking to "the common practices of other businesses" to determine what constitutes "good business practice." *Am. Postal Workers Union*,742 F. Supp. 2d at 82 (citations omitted); *see, e.g.*, *Reid*, 2006 WL 1876682, at *6 ("Whether an action is considered a good business practice can be ascertain[ed] by looking to the commercial world, management techniques, and business law, as well as to standards of practice adhered to by large corporations.") (quotation marks and citation omitted); *Airline Pilots Ass'n*, 2004 WL 5050900, at *6 ("The contours of the good business practice exemption are to be gleaned by looking to the commercial world, management techniques, and business law, as well as to the standards of practice adhered to be large corporations.") (internal quotation marks and citation omitted); *Robinett*, 2002 WL 1728582, at *5 ("[T]o determine what constitutes 'good business practice,' the agency can refer to business law and recommended management techniques in the commercial world.").  This is because the Postal Reorganization Act's emphasis on making the Postal Service a more businesslike public agency requires the Postal Service "to evaluate the information in the same manner as a corporation would in the commercial world." *Am. Postal Workers Union*, 742 F. Supp. 2d at 82.

Once the agency establishes that other businesses do not disclose the type of information requested, courts consider whether the plaintiff has submitted contrary evidence.  Put another way, in the face of the agency's assertion that other businesses do *not* disclose the type of information at issue, the burden shifts to the plaintiff to offer evidence that businesses *do* disclose such information.  *See Wickwire Gavin*, 356 F.3d at 594 ("[Plaintiff] has also failed to make *any* showing that [the Postal Service's] competitors, or any other businesses, do disclose the type of information at issue in this case."); *id.* at 596-97 ("[P]laintiff has fully failed to refute that other businesses, including other all-in-one pack and mail companies, do not disclose this type of information.").

Notably, there is no requirement that the agency establish that disclosure of the

14

information would result in competitive harm. *See Wickwire Gavin*, 356 F.3d at 594-95 (rejecting the plaintiff's argument that the good business practice exception requires a showing of competitive harm); *Am. Postal Workers Union*, 742 F. Supp. 2d at 82 ("The existing case law that addresses this issue make that a determination of whether the disclosure of the particular information would be a 'good business practice' does not rest on a conclusion of competitive advantage to the Postal Service[.]"). However, competitive harm to the agency can be considered "as one of the many considerations embedded within the good business practice exception itself." *Wickwire Gavin*, 356 F.3d at 595.

Here, Defendant contends that the Anderson Declarations sufficiently establish that the requested transactions-per-half-hour data would not be disclosed under good business practices. To that end, in his initial declaration, though referring to more categories of information than only the number of transactions per half hour, Mr. Anderson stated that he is "not aware of any business that voluntarily makes comparable market research freely available because it is precisely the type of information that competitors would want." (Dkt. No. 60-1 ¶ 9; *see also* Dkt. No. 60-1 ¶¶ 9-10, 12-14, 16, 20, 26.) In his supplemental declaration, referring specifically to the transaction-per-half-hour data, Mr. Anderson avers that he is "not aware of any business that makes comparable information publicly available." (Dkt. No. 63-1 ¶ 5.) In the Second Supplemental Anderson Declaration, again referring solely to the transaction-per-half-hour data, Mr. Anderson further asserts that "[i]n his experience and based on research [he] has conducted on some of the Postal Service's largest competitors, [he is] aware of no competitor of the Postal Service that publicly discloses similar data." (Dkt. No. 63-1 ¶ 7.) Mr. Anderson further avers that neither FedEx Corporation nor United Parcel Services, Inc. release such information in their publicly disclosed annual reports. (*Id.*)

Plaintiff urges that Mr. Anderson's statements are insufficient to demonstrate that other businesses do not disclose the information at issue. He takes issue with Mr. Anderson's choice of language—namely, that he avers only that he is "not aware" of any competitors that disclose similar information, which he contends is insufficient inasmuch as anyone could aver that they are "unaware" of conduct by burying their head in the sand and simply not looking into the matter.

15

1   But the Anderson Declarations indicate that this is not what Mr. Anderson has done.  First, Mr.
2   Anderson states that his prior position as Retail operations Specialist required him to be apprised
3   of the Postal Service's competitors' business practices.  (Dkt. No. 60-1 ¶ 3.)  With this as
4   background, in his Second Supplemental Declaration, Mr. Anderson clarifies that the conclusion
5   that he is unaware of any businesses that disclose the information is based both on his years of
6   experience in the Postal Service as well as research—at least into the practice of FedEx and UPS,
7   which the Court recognizes as the Postal Service's biggest competitors.  Other courts have relied
8   on similar declarations to establish the good business practice prong of a Section 410(c)(2) claim.
9   *See Am. Postal Workers Union*, 742 F. Supp. 2d at 82-83 (crediting as "sufficient, non-conclusory
10  support for defendant's position that the information requested is not generally released by
11  business in the private sector" a declaration of the Postal Service's records manager, who averred
12  that with limited exceptions detailed in the declaration, "private businesses do not routinely
13  disclose detailed salary information to the public.").  To be sure, the *American Postal Workers*
14  *Union* declaration affirmatively stated "businesses do not disclose" whereas here, Mr. Anderson
15  states that he is not aware of any such disclosures.  Defendant argues that in context with Mr.
16  Andersons' background knowledge of and research into competitors' business practices, the
17  practical effect of the statements is the same.  The Court agrees.  Thus, the Anderson Declarations
18  sufficiently establish that other businesses do not typically disclose this type of information.
19      In the face of these assertions, Plaintiff offers no evidence that other businesses *do* actually
20  disclose this type of information.  Plaintiff's "failure to build any record whatsoever concerning
21  the business practice of [the Postal Service's] competitors is fatal."  *Wickwire Gavin*, 356 F.3d at
22  594.
23      Plaintiff's arguments to the contrary are unpersuasive.  First, Plaintiff notes that Defendant
24  cited several cases for the proposition that the task of deciding what constitutes a good business
25  practice is not for courts to decide, but all of those cases were in employment discrimination cases.
26  (*See* Dkt. No. 66 at 18.)  *See, e.g.*, *Calder v. TCI Cablevision of Mo., Inc.*, 298 F.3d 723, 729 (8th
27  Cir. 2002) ("Whether or not those new expectations [that the plaintiff did not meet] constituted a
28  good business practice is not for us to decide."); *Dorsey v. Pinnacle Automation Co.*, 278 F.3d

16

830, 837 (8th Cir. 2002) (Courts do not sit as super-personnel departments to second guess the business decisions of employers."). On the one hand, the Court sees no reason why the logic behind those statements should not apply equally here: because it is not the Court's role to determine what constitutes a good business practice, the Court should look to businesses for the proper standard. But even if Plaintiff is correct that these cases are inapposite, he offers no cases to refute the established case law that directs courts to look to other businesses' practices to determine what constitutes a good business practice.

At bottom, Plaintiff's main argument against a finding that the information at issue here would not be disclosed under good business practices is his disagreement with the legal standard as formulated by all of these other courts, contending that the approaches "provide defendant broad and excessive discretion to withhold information from FOIA requesters" and submitting that the judicial interpretation of the term "is not consistent with the text or intent of the statute." (Dkt. No. 66 at 16.) Instead, Plaintiff urges the Court to impose the competitive harm requirement that other courts have expressly rejected and asks the Court to scrap the well-established case law that directs courts to look to the practices of other businesses. Appearing to concede that no court has adopted the position for which he now advocates, Plaintiff simply calls the existing approach flawed and asks the Court to make new law. The Court declines Plaintiff's invitation to reject the well-reasoned logic of the *Wickwire Gavin* court and the other district courts across the country to have addressed this issue.

However, even accepting Plaintiff's position that commercial information must be disclosed unless it could place Defendant at a competitive disadvantage, the Court would reach the same conclusion. The Anderson Declaration sufficiently describes how Defendant's competitors could use the transaction-per-half-hour data that Defendant compiled to adjust their own staffing practices to offer shorter wait-times and more efficient services than the nearby Postal Service branch, thus attracting Defendant's customers to Defendant's detriment. (*See* Dkt. No. 60-1 ¶¶ 9-14, 16, 19-21, 25-26; Dkt. No. 63-1 ¶ 5; Dkt. No. 65-1 ¶ 5.) While Plaintiff underscores that Defendant is the exclusive provider of certain services, like First Class Mail, such that some customers will patronize Defendant despite shorter lines elsewhere, this is not enough to

overshadow that Defendant stands to suffer at least some competitive harm. Thus, even under Plaintiff's formulation of the standard, he has failed to rebut Defendant's assertion that the information would not be disclosed under good business practices.

Finally, Plaintiff attempts to distinguish his case from the pack by noting that none of the cases that Defendant cites involve as strong a public interest in disclosure as his insofar as they involved commercial disputes whereas he seeks the information to evaluate and respond to Defendant's decision to limit public access to postal services by reducing window hours at certain branches. But the Ninth Circuit is clear that the reasons why a plaintiff requests information is not relevant to the determination of whether an exemption applies. *Forest Serv. Emps. Envt'l Ethics*, 524 F.3d at 1025. While the *Forest Service* case addressed Exemption 6, *see id.* at 1024, courts have emphasized that a plaintiff's reason for requesting the information is likewise irrelevant for the purposes of other exemptions, as well. *See, e.g.*, *Coastal Delivery Corp. v. U.S. Customs Serv.*, 272 F. Supp. 2d 958, 964 (C.D. Cal. 2003) (Exemption 5); And indeed, the Ninth Circuit's reasoning is more broadly applicable to all exemptions: "FOIA provides every member of the public with equal access to public documents and, as such, information released in response to one FOIA request must be released to the public at large." *Id.* at 1025.

Accordingly, Defendant has established that the transactions-per-half-hour information at issue here would not be disclosed under good business practices, and Plaintiff has failed to refute that with any evidence. Defendant has therefore met its burden of demonstrating that the records responsive to Plaintiff's FOIA requests set forth in Counts 3, 14, and 15 consist of commercial information that would not be disclosed under good business practices and, thus, that the records fall within the purview of Section 410(c)(2) and are therefore exempt from disclosure under Exemption 3.

## CONCLUSION

For the reasons described above, the Court GRANTS Defendant's motion for summary judgment and DENIES Plaintiff's motion for summary judgment. Accordingly, the Court denies Plaintiff's request for an award of costs. As this Order resolves all remaining issues in this action, judgment will be entered in favor of Defendant and against Plaintiff.

This Order disposes of Docket Nos. 60, 61.

**IT IS SO ORDERED.**

Dated: December 18, 2015

_____
JACQUELINE SCOTT CORLEY
United States Magistrate Judge